```
CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

AMANI S. FLOYD (CABN 301506)
Assistant United States Attorney

    60 South Market Street, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-5596
    FAX: (408) 535-5066
    Amani.Floyd@usdoj.gov

Attorneys for United States of America
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JESUS DIAZ-MAGALLON, a.k.a. "CHUY", <br><br> Defendant. | Case No. CR-22-200-BLF <br><br> **UNITED STATES' SENTENCING MEMORANDUM** |

## I. INTRODUCTION

Defendant Jesus Diaz-Magallon was one of two defendants originally charged by criminal complaint on April 16, 2021 with violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) – Distribution of 5 Grams or More of Methamphetamine for his role in selling one kilogram of methamphetamine to a confidential informant. Dkt. 1. On May 16, 2022, Diaz-Magallon was charged via Information with the same crime. Dkt. 45. However, on October 24, 2023, the government filed a Superseding Information, dropping the 5-year mandatory minimum against Diaz-Magallon. *See* Dkt. 69.

On October 1, 2025, Diaz-Magallon pled guilty to Count One of the Superseding Information pursuant to a plea agreement. Dkt. 102. Diaz-Magallon is set for sentencing before the Honorable Beth Labson Freeman on February 3, 2026.

As discussed in more detail below, the government agrees with U.S. Probation's calculation of the applicable Guidelines range of 63-78 months' imprisonment. However, while Probation recommends a sentence of 36 months' imprisonment, the government believes that a more serious punishment is warranted in this case considering the serious nature of the offense and the need to deter others from engaging in similar crimes. As such, the government recommends a bottom of the Guidelines sentence of 63 months' imprisonment, followed by a term of supervised release, for Diaz-Magallon's unlawful conduct.

## II.   BACKGROUND

### A.   Offense Conduct

This prosecution is the result of a major narcotics investigation into a large-scale methamphetamine and cocaine trafficking organization that was operating in the San Jose, CA area and that was led by an individual named Ramon Covarrubias Rangel (the "Covarrubias DTO"). During the investigation into the Covarrubias DTO, Diaz-Magallon was intercepted over a wiretap that was installed on Covarrubias' telephone. While the call did not appear to be directly related to drug trafficking on its face, agents from Homeland Security Investigations (HSI) had separate and independent information that Diaz-Magallon was trafficking in drugs and thus pursued an investigation into Diaz-Magallon with the use of a confidential informant (the "CI").

On November 20, 2020, the CI contacted Diaz-Magallon, who asked the CI if the CI wanted "windows" (methamphetamine) from "Mexico or from here?" Presentence Investigative Report ¶ 10. The two then began to arrange a methamphetamine deal. *Id.* ¶ 11.

The next day, on November 21, 2020, Diaz-Magallon contacted the CI to tell the CI the price of methamphetamine from Mexico, which was $6,500 per kilogram. *Id*. ¶ 12. Diaz-Magallon also told the CI that he could get however many kilograms of methamphetamine that the CI needed. *Id*.

Approximately two weeks later, on December 8, 2020, Diaz-Magallon and the CI spoke again. *Id*. ¶ 13. During the call, Diaz-Magallon told the CI that all he needed to know was what kind of methamphetamine the CI wanted and the quality. *See id*. Diaz-Magallon said that he would "call right now to check it out"—indicating that he had ready access to large quantities of methamphetamine. *Id*.

Right after talking to the CI on December 8, 2020, Diaz-Magallon placed several phone calls to

his co-conspirator, Lance Torregroza. *Id*. ¶ 14. Later that day, Diaz-Magallon called the CI and told the CI: "Okay, cuz everything is ready for tomorrow . . ." and dropped the price of a kilogram of methamphetamine to $6,200. *Id*. ¶ 15. Diaz-Magallon then agreed to meet with the CI the next day for the transaction. *Id*. ¶¶ 15, 16.

On December 9, 2020, agents established surveillance at the location that Diaz-Magallon provided to the CI. *Id*. ¶ 16, 17. That afternoon, after Diaz-Magallon told the CI that the methamphetamine was being delivered, agents observed Diaz-Magallon meeting with Torregroza who was driving a red Dodge Ram. *Id*. ¶ 19. After briefly talking, Diaz-Magallon entered his own vehicle and departed with Torregroza following him in the Dodge Ram. *Id*.

Both Diaz-Magallon and Torregroza traveled to meet with the CI for the scheduled transaction. *See id*. ¶ 20. When they arrived at the agreed upon location, a Bass Pro Shop, it was Diaz-Magallon who got out of his car, who walked over to the CI, and who escorted the CI to Torregroza's vehicle where the one kilogram of methamphetamine was located. *Id*. It was also Diaz-Magallon who collected payment for the methamphetamine sold to the CI. *Id*.

During the deal, Diaz-Magallon told the CI that he could get good quality cocaine for the CI and quoted $44,000 per kilogram. *Id*. ¶ 22. He also told the CI that there was a cheaper second tier and that both the methamphetamine and cocaine came from Zapopan (a city located in Jalisco, Mexico). *Id*.

The methamphetamine that Diaz-Magallon and Torregroza sold to the CI was later confirmed to be 985.9 grams of methamphetamine hydrochloride, or "Ice."

### III.  GUIDELINES CALCULATION

The government concurs with Probation's calculation of Diaz-Magallon's Guidelines range—i.e., a Total Offense Level of 26 and Criminal History Category I, yielding an advisory Guidelines range of 63 - 78 months' imprisonment.

The basis for the mitigating role adjustment (minor participant) under U.S.S.G. §3B1.2(b) is that Diaz-Magallon is believed to have been a minor dealer in Covarrubias DTO. While his conduct was serious, it was not as significant as the others in the investigation. For example:

- Covarrubias, who is believed to be the leader/organizer of the Covarrubias DTO, is believed to have been trafficking hundreds of kilograms of methamphetamine in the San Jose, CA area.

*See* CR 21-100-EJD.

- Jorge Lozano Guzman, who was a courier and facilitator for the Covarrubias DTO, arranged and conducted four controlled buys of methamphetamine and cocaine during the course of the investigation. *See* CR 21-081-EJD.

- Kelman De La Cruz Pedroza, a narcotics broker who worked with the Covarrubias DTO, was intercepted arranging a 10-kilogram cocaine deal and arranged two drug deals with a confidential source during the course of the investigation. *See* and CR 21-409-EJD.

- Erik Alexandro Torres Cruz, who was a broker and courier for the Covarrubias DTO, arranged three methamphetamine deals during the course of the investigation. *See* CR-21-082-EJD.

Diaz-Magallon, on the other hand, arranged a single methamphetamine deal. Compared to others in the investigation, he is less culpable.

## IV. SENTENCING RECOMMENDATION

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the defendant, and rehabilitate the defendant. 18 U.S.C. § 3553(a)(2); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). Section 3553(a) sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991.

Importantly, although they are not binding, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives" *Rita v. United States*, 551 U.S. 338, 350 (2007), and should be the starting point and the initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007).

In this case, the government's bottom of the Guidelines recommendation of 63 months of imprisonment is primarily driven by the seriousness of Diaz-Magallon's offense conduct and the need to deter others from committing similar offenses. While Diaz-Magallon is not the most culpable member of

the Covarrubias DTO, his conduct was serious. As the Court is aware, the distribution of illegal narcotics has caused unimaginable harm in our community and throughout the United States. Diaz-Magallon is responsible for selling 985.9 kilograms of pure methamphetamine to a CI. To put that in perspective, the average individual dose of methamphetamine is approximately 0.20 grams of methamphetamine. That means that Diaz-Magallon knowingly sold approximately 4,930 average individual doses of methamphetamine to a CI—all of which he presumably thought would end up in the bodies of customers. What is even more concerning is that this number does not even account for the indeterminate amount of methamphetamine and cocaine that he sold to unknown parties over the years.

The government submits that a Guidelines sentence in this case appropriately takes into consideration the nature and seriousness of the offense, the quantity of drugs involved, Diaz-Magallon's role in the criminal conduct, his criminal history, the purposes of sentencing, and his acceptance of responsibility.

### V.   CONCLUSION

In sum, considering the 3553(a) factors, the United States respectfully requests that the Court sentence Diaz-Magallon to a low-end sentence of 63 months' imprisonment, followed by a term of supervised release.

DATED: January 27, 2026                              Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_____/s/_____
AMANI S. FLOYD
Assistant United States Attorney